## UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | **Case No.: 1:17-CR-193-02-WSD** |
| **v.** ) | |
| ) | |
| **LESHANDA HUNTE** ) | |
| ) | |
| _____) | |

## SENTENCING MEMORANDUM

COMES NOW, the defendant, Leshanda Hunte, by and through undersigned counsel and files this sentencing memorandum for the court to consider and states as follows:

At this time the defendant has not received the final version of the Pre-Sentence Report.

## OBJECTIONS TO PSR

**Paragraph 9:**

Defendant objects to the fact that the probation office gathered all its information from the file in possession of the United States Attorney's Office.  The investigative reports were not introduced at the trial of the defendant and no investigator from the I.R.S. or Postal Service testified.  The information obtained for the PSR should have been obtained from the evidence admitted at trial.

Counsel is unaware of what reports of a non-testifying witness were used and for what purpose.

**Paragraph 10:**

Defendant objects to the statement "starting in August 2011". The Superseding Indictment states "beginning on a date unknown to the Grand Jury, but at least by on or about September 5, 2012". The record is without any evidence and is unclear if any evidence of prior conduct was part of this conspiracy.

The Superseding Indictment under "Overt Acts" specifically sets forth five deposits from September 5, 2012 to October 25, 2012.

Although, as this court has allowed pursuant to 404(b), evidence of other crimes to prove knowledge and there is no evidence that any dates prior to September 5, 2012 were part of this conspiracy.

**Paragraph 11:**

The defendant objects to the fact that there is no mention of monies withdrawn from the accounts by Ralph Menard. His testimony was that those monies were then given to an individual above him, Andre Crooks. The statement that all monies were used by the defendant for personal expenses is false.

**Paragraph 15:**

There is no evidence that the defendant introduced Lawrence as J.A.  In fact, there was no evidence presented to the jury that the defendant and Lawrence even arrived at the bank together.  In addition, the defendant did not present a bank employee with a fake driver's license and fake American Express card.

The government responded to this objection by stating that Mr. Ousley sat with the defendant and J.A. to complete the paperwork in order for the defendant to withdraw the funds.  Mr. Ousley stated that he completed the paperwork.

The evidence at trial, from the bank manager, Margoth Paspuel, who was called by the government was that the paperwork completed for Lawrence (J.A.) was done by, Felipe (another bank representative) and she recognized his handwriting.

**Paragraph 18:**

The defendant objects to the use of tax returns deposited prior to the date of September 5, 2012, the date in the superseding indictment.  The government chose to wait until June 8, 2017 to indict the defendant although the information concerning the facts of this case were available to them on November 2, 2012.  In addition, the government chose to not include the dates of June 8, 2012 to November 2, 2012 in their superseding indictment.

The deposits listed should begin with the deposit made on 9/5/12. The total (Attempted Loss) should be $127,590.00 and the Total (Actual loss) should be $109,665.00.

A review of the deposits gathered by the probation office from the government's file shows a clear difference in checks deposited prior to September 5, 2012. From September 5, 2012 to November 2, 2012, paragraph 18 of the PSR indicates a total of 19 checks deposited in just 9 weeks. This differs from the 11 checks deposited from January 3, 2012 to July 30, 2012 (7 months). The government would have to show that these checks were part of the same conspiracy.

The court allowed the testimony of Pier Mason (404(b)), who testified that she spoke to a Shonda Johnson about filing her tax return for 2012. She gave her information, social security number, address, W-2's to this person identifying herself as Shonda Johnson and was not forced to do so. Her tax return was filed, although she testified she did not authorize it. She only received a portion of the tax refund. This specific account differs from every other tax return involved in this conspiracy. This cannot be considered part of the same common scheme or plan. The court must then determine if they are the same course of conduct. *U.S. v Wall,* 180 F. 3d 641 (5th Cir. 1999)

The only evidence presented during the trial of any overt act by the defendant is the single act of going into the bank to get cash on October 30, 2012, 3 days before the conspiracy ended.  She never deposited a single I.R.S. tax refund check.

The government chose not to respond to this objection by the defendant.

**Paragraph 19:**

The restitution amount on line 5 should be $71,928.72.

**Paragraph 20:**

There are only 19 victims between September 5, 2012 and November 2, 2012 and therefore the number 42 is incorrect.

The defendant as stated in her objection to paragraph 24, objects to any number of victims as the indictment lists only one victim, the United States. Again, the defendant is not charged with identity theft and there is no evidence that this conspiracy included identity theft and the defendant had knowledge of that fact.

**Paragraph 23:**

The defendant objects to the loss amount of $290,047.  This amount is calculated using the governments case file and includes tax returns outside the scope of the superseding indictment.

The loss amount should be $109,665 with an increase in offense level of 8.

**Paragraph 24:**

The single count of conspiracy charged in the superseding indictment lists the sole victim as the United States, funds administered by the Department of the Treasury.  There are no other victims in this case.  The indictment does not charge the defendant with identity theft.

**Paragraph 25:**

The defendant objects to this 2-level increase as the superseding indictment makes no mention in the manner and means of the conspiracy, that unauthorized use of any means of identification was used to produce any other means of identification.

The governments response is that the 2-level increase applies because Lawrence, aided and abetted by Hunte, used a false driver's license.  Here again, the defendant is not charged with anything other than theft of government funds.

The evidence at trial was that on November 2, 2012, when Raphael Menard was arrested at the bank, he was driving the car belonging to Lawrence.  In that vehicle were false identifications.  In addition, Menard testified that he alone was responsible for obtaining the false identifications used by Lawrence.

**Paragraph 27:**

The defendant objects to the 2-level increase on the basis that she was an organizer, leader, manager, or supervisor of a criminal activity.  The evidence presented at trial, not from reports of investigators was that;

The government had and has no evidence of who had filed these tax returns.

The government had and has no evidence of how the information used on the tax returns was obtained.

The government had and has no evidence of how these tax return checks were received in the mail,

The governments evidence and evidence at trial was that Ralph Menard deposited all the tax return checks and placed his signature on the back of those checks.

The statement in the PSR that the "defendant recruited her cousin to go with her to Chase B to impersonate J.A" is without any factual basis.  In fact, at trial Menard testified that he alone asked Lawrence to go to the bank.

There is no evidence in the record which gives rise to the fact that the defendant should be given a role adjustment for organizer, leader.

The government had no response to the defendant's objection to this 2-level increase in role adjustment.

**Paragraph 32:**

The total offense level should be 14.

**Paragraph 45:**     Should now include the additional fact; the defendant's son has completed all testing for a liver transplant and as of Friday 4-14-18 the team of doctors has approved him to be placed on the liver transplant list.  The defendant is considered a possible donor and will now begin testing in that regard.

**Sentencing Options:**

The Total offense level should be 14.

The Custody Guideline Range should be 15 – 21 months.

## A.

District courts have discretion in determining sentences according to the provisions of 18 U.S.C. § 3553(a). *United States v. Booker*, 543 U.S. 220, at 259-60 (2005). Section 3553(a)(2) states that a district court should impose a sentence sufficient, but not greater than necessary and (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed . . . training, medical care, or other correctional treatment.

Section 3553(a) further provides that the district court should weigh factors such as "the nature and circumstances of the offense and the history and characteristics of the defendant;" "the kinds of sentences available;" "the [applicable] sentencing range [;]" the articulated policy goals of the guidelines; "the need to avoid unwarranted sentence disparities" among similar defendants; and "the need to provide restitution to any victims of the offense." § 3553(a)(1), (3)-(7).

The guidelines are now merely one of the factors that the Court must consider in sentencing:

Now, when a district court imposes, and we review a sentence for reasonableness, the focal point is on 18 U.S.C. §3553(a) (footnote omitted). In Section 3553(a), there are numerous factors for a court to consider and under *Booker's* remedial holding; the sentencing guideline range is one of those factors. That is, while the guidelines remain important, they are now just one of the numerous factors that a district court must consider when sentencing a defendant. See e.g., *United States v. Webb*, 403 F.3d 373 (6th Cir. 2005) ("While a district court must still give some consideration to the appropriate guideline range when making a sentencing determination, a court is no longer bound by the applicable guidelines.) . . .

Once the appropriate advisory guideline range is calculated, the district court throws this ingredient into the Section 3553(a) mix. Considering, as *Booker* requires, all the relevant Section 3553(a) factors, including the guideline range, the district court then imposes a sentence.

*United States v. McBride*, 434 F.3d 470, 475-76 (6th Cir. 2006).

In *United States v. Gunter,* 462 F.3d 237 (3rd Cir. 2006), the Court set forth a three-step post-*Booker* sentencing procedure that District Courts must employ:

(1)  Courts must continue to calculate the defendant's guideline sentence precisely as they had done prior to *Booker*.

(2)  In doing so they must formally rule on the motions of both parties and state on the record whether they are granting a departure, how that departure affects the guideline calculation and consider pre-Booker case law which continues to have advisory force.

(3)  Finally, they are required to exercise their discretion by considering the relevant § 3553(a) factors..."

*See United States v Booker,* 125 S.Ct. 738 (2005); *Kimbrough v United States,* 128 S.Ct. 558 (2007); *Gall v United States,* 128 S.Ct. 586 (2007); *Nelson v United States,* 129 S.Ct. 890 (2009); *Dean v United States,* 137 S.Ct. 1170, 1175

(2017); *United States v Talley,* 431 F.3d 784 (11th Cir. 2005); *United States v Pugh,* 515 F.3d 1179 (11th Cir. 2008).

B.

## SENTENCING GUIDELINES

## DEPARTURE FROM THE ADVISORY GUIDELINE RANGE

## §3553(a) FACTORS

A sentence of pursuant to the advisory guideline range does not consider all the reasons for departure or the relevant 3553(a) factors pertinent to sentencing. Ms. Hunte requests that this Court consider the following arguments for a downward variance.

## I.     VARIANCE

Although briefly mentioned in the PSR, the health of the defendant's son and the need for her to support and care for him should be considered by the court.  The defendant's son M.R. suffers from a condition, Biliary Atresia, which will require a liver transplant.  On April 19, 2018, the medical team certified M.R. as a candidate for a liver transplant and has been placed on the transplant list. (See Exhibit 1)

The defendant has been gainfully employed at Delmar Gardens for almost 4 years.  She is the Assistant Executive Director.  Her supervisor Dawn St. Fleur

has been informed of this case and its outcome and has kept the defendant employed throughout the pendency of this case, even after the defendant was convicted. Ms. St. Fleur has indicated that the defendant has her job at Delmar gardens until she is taken into custody. The employment at Delmar Gardens allows the defendant to care and provide for her children without the need for State or Federal monetary assistance. In addition, this employment provided health care for herself and her 2 children. Without the healthcare for M.R. it is unlikely the defendant could pay the cost of treatment and the after care needed after transplant surgery.

Mr. Menard does not have a full-time employment which can provide health care for the children. The defendant has been the major bread winner for the family since November 2012.

In addition, her son has cognitive, speech and developmental issues which have been diagnosed by the Cobb County school system. He is being treated with speech and developmental therapy.

There are no limitations on the information the Court may consider at sentencing "concerning the background, character, and conduct of a person convicted of an offense." 18 U.S.C. §3661. As part of its consideration of these factors, the court must recognize "that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. §3582(a).

18 U.S.C. § 3553(a) does not direct the Court to give greater weight to some factors over others, and the Court may now consider factors that previously were considered "prohibited factors" or "not ordinarily relevant" under the sentencing guidelines, such as family circumstances, age of the defendant, mental and emotional conditions, physical condition, employment record, and lack of guidance as a youth. See U.S.S.G. § 5H1.1-.12 (listing the relevance of certain offender characteristics).

> In a similar case, this Court examined a district court's downward departure from the applicable guideline range based on factors previously discouraged under the mandatory guidelines. *See United States v. Jackson,* 408 F.3d 301, 304 (6th Cir. 2005). We observed in *Jackson* that although the downward departure based on previously discouraged and prohibited factors "would almost certainly have been problematic under the Guidelines" prior to the Supreme Court's decision in *Booker,* the court's departure may be reasonable under the now-discretionary guidelines. *Id.* at 304.

Since *Booker,* cases have clarified that the advisory guidelines sentencing range is **not**, the *per se* reasonable sentence. *United States v. Webb*, 403 F.2d 373, 385 (6th Cir. 2005) (noting that such a rule would be "not only inconsistent with the meaning of reasonableness but is also inconsistent with the Supreme

Court's decision in *Booker*, as such a standard would effectively re-institute mandatory adherence to the guidelines.'" *United States v. Williams* 436 F.3d 706 (6th Cir. 2006) held that on appeal "sentences properly calculated under the guidelines will be credited with a rebuttable presumption of reasonableness"). The holding in *Williams* was clarified in *United States v. Marco Eugene Foreman* 436 F.3d 638 (6th Cir. 2006), in which the court explained:

> "although this statement seems to imply some sort of elevated stature to the guidelines, it is in fact rather unimportant. *Williams* does not mean that a sentence outside of the guideline range— either higher or lower—is presumptively unreasonable, it is not. *Williams* does not mean that a guideline sentence will be found reasonable in  the absence of evidence  in the record that a district court consider all of the relevant 3553(a) factors . . . moreover, *Williams* does not mean that a sentence within the guidelines is reasonable if there is no evidence that the district court followed its statutory mandate to "**impose a sentence sufficient, but not greater than necessary"**  to comply with the purposes of sentencing in Section 3553(a)(2).

*Id. at 644.* (Emphasis added).

The health of Ms. Hunte's son, especially his need for a liver transplant and aftercare, can also justifiably enter this Court's sentencing decision.

Under U.S.S.G. §5Hl.6, family responsibility is not a factor ordinarily relevant in determining whether a departure may be warranted. Though designated a discourage factor, it may be relied upon by a court for departure when it is present to an exceptional degree or *in* some other way making its case different from the ordinary case where that factor may be present. *United States v. Koon,* 116 S.Ct. 2035, 2045 (1996). Clearly, the factor of family responsibility, as it regards Hunte, is present in an extraordinary way.

Yet, even more pertinent is *United States v. Menyweather,* 447 F.3d 625 (9th Cir. 2006). The defendant, a federal employee having embezzled over $350,000 from a United States Attorney's Office, was the sole parent and primary source of financial support for her 11-year-old daughter. Finding the defendant to be an irreplaceable caretaker, the Court upheld a reduction in Guideline Levels, not as a §5Hl.6 departure, but rather as a §3553(a)(l) variance. In this regard, it held that a sentencing court, after *Booker,* to extend beyond the Guidelines, may justify family responsibilities as part of a balancing of factors under §3553(a) and, in particular, as an aspect of the defendant's history and characteristics under §3553(a)(l). *Id* at 634. Any alternatives must be "reasonably available," which means "feasible"

and "relatively comparable" to the defendant. *United States v. Roselli,* 366 F.3d 58, 68-69 (1st Cir. 2004).

After *Booker,* the fact that a factor is disqualified or forbidden under the Guidelines does not automatically make it irrelevant when a court is weighing statutory sentencing factors apart from the Guidelines. *United States v. Husein,* 478 F13d 318 (6th Cir. 2007).

In *United States v Alba,* 933 F.2d 1117 (2d Cir. 1991), a downward departure under §%H1.6 was held not to be an abuse of discretion where the defendant lived with his disabled father who depended on his son to get in and out of a wheelchair.  In *United States v Dominguez,* 296 F.3d 192 (3d Cir. 2002), it was held that "although the ordinary impact of a sentence on family members will not support a downward departure, where the impact is unusual or extraordinary, the district court has discretion." Id. At 195.  To the court, the term "extraordinary" meant no more than outside of the heartland and not by any degree of magnitude: the circumstances of the case placed it simply outside the ordinary. Id.

In *United States v Leon,* 341 F.3d 928 (9th Cir. 2003), the defendant was convicted of 32 counts of preparing false income tax returns, was the sole support of his dependent wife who was recovering from the removal of a kidney due to renal cancer.  The court reiterated the standard that family

responsibility is not ordinarily a relevant factor regarding departure unless circumstances are sufficiently outside the ordinary.    Noting that, "permissible downward departures generally involve situations where the defendant is an irreplaceable caretaker of elderly or seriously ill family members," Id. At 931, it sustained a six (6) level reduction from level 18 to level 12 which, within Zone C, permitted a split sentence involving home detention as a condition of probation.  *See* U.S.S.G. §5D1.1, comment (n4): *United States v Schroeder,* 536 F.3d 746 (7th Cir. 2008), ("[w]hen a defendant presents an argument for a lower sentence based on extraordinary family circumstances, the relevant inquiry is the effect of the defendant's absence on his [her] family members"); *United States v Munoz-Nava,* 524 F.3d 1137 (10th Cir. 2008) holding that  the sentencing court's finding that the defendants family circumstances were extraordinary – the defendant cared for his eight-year-old son as a single father and had elderly parents with serious medical conditions; *United States v Lehmann,* 513 F.3d 805 (8th Cir. 2008) (affirming a downward variance to probation, where the district court found that a prison sentence would negatively affect the defendant's disabled young son).

## II.   DOWNWARD DEPARTURE

The United States Sentencing Commission has proposed an amendment to the Sentencing Guidelines: U.S.S.G. §4C1.1 entitled "First Offender."  Under this proposed amendment, a defendant not receiving any criminal history points and having no prior convictions of any kind would receive a one (1) level downward departure if the offense level were more than 16.  The defendant would be entitled to this departure based if the court finds that her adjusted offense level is more than 16.

Although there have been public hearings on this amendment it has not been approved.

In *United States v Montgomery,* 165 Fed. Appx. 840, 843 (11th Cir. 2006) a downward variance was found reasonable where the defendant, convicted of bank fraud, was a "First Offender" not likely to commit further crimes and ordered to make restitution as a condition of supervised release.

The Commission proposed this amendment based on recidivism data that indicated first offenders pose a low risk of recidivism.  Along with this, the Commission proposed consolidating Zone C into Zone B to implement the 28 U.S.C. §994(j) directive that alternatives to incarceration are generally appropriate for first offenders.

Defendant requests that this court consider a one-point downward departure based upon the Commissions proposed amendment and the fact that she is a first offender.

## C.

## ARGUMENT

The important message sent by the Court's sentence here can be accomplished not by a term of incarceration, but by a sentence which incorporates all the reasons for departure and 3553(a) factors set forth in this memorandum. 18 U.S.C. §3553(a)(2) requires that a sentence reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. It must also serve to afford adequate deterrence to criminal conduct. These important sentencing goals can be attained by a sentence other than prison.

A conviction for a Federal Crime is a Scarlett Letter that the defendant must wear for the rest of her life. It is punishment in and of itself.

The charges in this case, give discretion to this Court, once a departure is granted or variance based on 3553(a) factors, to sentence the defendant to probation with one of the following, unless extraordinary circumstances exist: a fine or community service.

Based on the arguments set forth in the sentencing memorandum, the defendant respectfully requests that this court grant a departure from the advisory guideline range and then grant a downward variance. Ms. Hunte would respectfully argue that granting a departure and downward variance would justify a below-guideline advisory sentence, and it is his hope that the Court will consider a period of probation with community service.

Ms. Hunte also requests that if this court sentences her to a period of incarceration that it be staggered to allow her to remain with her child(ren) while Raphael Menard completes his sentence.

Respectfully Submitted,

Gary Rosenberg, P.A.

_____

 _/s/ Gary Rosenberg
GARY I. ROSENBERG
1555 North Park Dive
Suite 103
Weston, Florida 33326
Tel: (305) 801-3635
Fax: (954) 358-1780
Email: grosenberglaw@gmail.com

## CERTIFICATE OF SERVICE

These objections to the PSR have been electronically mailed to:
US Probation Officer Kevin M. Bennett @ kevin_bennett@ganp.uscourts.gov &

Meg Strickler @ meg@cs-lawyers.com
AUSA Trevor Wilmot @ trevor.wilmot@usdoj.gov &
AUSA Samir Kaushal @ Samir.kaushal@usdoj.gov

And filed via CM/ECF on this 30th day of April 2018.


/s/ Gary Rosenberg


## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document complies with the typeface and type style requirements of Local Rule 5.1B, specifically Times New Roman 14 point.


/s/ Gary Rosenberg



Children's
Healthcare of Atlanta
*Dedicated to All Better*



4/18/2018

Patient Name: R███████ M██████
███: ███████████
Address: ███ ███████ ███████ ██
Marietta GA 30064

Dear M██████ Family:

This letter is to inform you that we have listed R███████ with the United Network for Organ Sharing (UNOS) on April 19, 2018. His PELD/MELD Score is -8. Raphael is now eligible for a transplant as soon as a matching organ becomes available.

When organs are donated, the procuring organization accesses the national transplant computer system, through the Internet, or contacts the UNOS Organ Center directly. In either situation, information about the donor is entered into UNet and a donor/recipients match is run for each donated organ.

The resulting match list of potential recipients is ranked according to objective medical criteria (i.e. blood type, tissue type, size of organ, medical urgency of the patient as well as time already spent on the waiting list and distance between donor/recipient). Each organ has its own specific criteria.

Using the match of potential recipients, the local organ procurement coordinator, or an organ placement specialist, contacts the transplant center of the highest ranked patient, based on policy criteria, and offers the organ. If the organ is turned down, the next potential recipient's transplant center on the match list is contacted. Calls are made to multiple recipient's transplant centers in succession to expedite the organ placement process until the organ is placed. Once the organ is accepted for a patient, transportation arrangements are made and the transplant surgery is scheduled.

If you would like to learn more about this process, you may log-on to www.unos.org and/or review the attached letter from the United Network for Organ Sharing (UNOS). It describes the services and information offered to patients by UNOS and Organ Procurement and Transplant Network.

Please note that it is your responsibility to advise the transplant team of any changes in phone numbers or address so that we may contact you at any time.

As always, please do not hesitate to contact our office at 404-785-1807 if you have any questions or concerns.

Sincerely,

*Donna Hernandez, RN*

Donna Hernandez, RN
Clinical Nurse Coordinator
Children's Healthcare of Atlanta, Egleston