# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.                                   1:17-cr-193-WSD-2

LESHANDA HUNTE,

            Defendant.

## OPINION AND ORDER

This matter is before the Court on Defendant Leshanda Hunte's ("Defendant") Motion for New Trial Pursuant to Rule 33(b) [117] ("Motion").

## I. BACKGROUND

### A. Procedural History

On June 8, 2017, a federal grand jury returned a six-count indictment [1] charging Raphael Menard and Defendant Hunte with conspiracy under 18 U.S.C. § 371 (Count 1) and theft of government money under 18 U.S.C. § 641 (Counts 2 through 6). On January 11, 2018, Mr. Menard pleaded guilty to conspiracy. See United States v. Raphael Menard, No. 1:17-cr-193-1 (N.D. Ga. January 11, 2018), Docket Nos. 55-56.

On January 16, 2018, a federal grand jury returned a First Superseding Indictment [58.1] against Defendant Hunte. The First Superseding Indictment charges that, from September 5, 2012, until November 2, 2012, Defendant Hunte, her then fiancée Menard, and others conspired and stole government money in the form of federal tax refunds issued because of fraudulent federal tax returns. (Id.) As alleged, the conspirators caused the tax refunds to be deposited into two Chase Bank accounts (ending in 8063 and 2018) opened jointly by Hunte and Menard. (Id., ¶ 5, 6(a)-(b)). Count 1 of the First Superseding Indictment charges Hunte with conspiracy under 18 U.S.C. § 371. Counts 2 through 6 charge Hunte with theft of government money under 18 U.S.C. § 641 and aiding and abetting under 18 U.S.C. § 2.

| COLUMN A | COLUMN B | COLUMN C | COLUMN D | COLUMN E |
|---|---|---|---|---|
| Count | Individual | Month/Year | Amount | Account Ending |
| 2 | M.L. | 9/5/2012 | $8,504.00 | 8063 |
| 3 | R.W. | 9/25/2012 | $8,109.00 | 2018 |
| 4 | A.R. | 9/26/2012 | $8,573.00 | 8063 |
| 5 | I.F. | 9/26/2012 | $9,140.00 | 2018 |
| 6 | J.A. | 10/10/2012 | $8,573.00 | 2018 |

On February 12, 2018, the case against Hunte went to trial. On February 16, 2018, the jury found Hunte guilty of Counts 1 through 6. ([93]).

B.  Defendant's Motion for New Trial

Defendant filed her Motion for New Trial on May 6, 2018, two days before her originally scheduled sentencing. The Motion alleges that Defendant's discovery of new evidence that was not produced by the Government until May 4, 2018, warrants a new trial. The Court continued Defendant's sentencing hearing to May 23, 2018, and set a briefing schedule to resolve the Motion before sentencing.

Defendant grounds her motion on the receipt of new evidence suppressed by the Government and produced four days before her originally scheduled sentencing hearing. The Government informed Defendant that Special Agent Mario Buford would be testifying at her sentencing hearing. Special Agent Buford did not testify at trial and during the course of his preparation for the sentencing hearing the Government learned of additional investigative memos made by him that had not been previously produced. On May 4, 2018, the Government produced those investigative memos totaling 58 pages of documents[1]. ([126.3] at SENTENCING000008 through SENTENCING000065 (the "Documents")). The Government stated they would not use those memos at sentencing. ([117] at 9).

---

[1]  Defendant states there are 26 investigative reports, but the Court counts 28 reports in the materials produced by the Government and submitted with the Government's response. ([126.3]).

The Documents reflect interviews with at least 23 different people[2]. Defendant's Motion, however, focuses on only two. First, Defendant claims that the interview of Sam Thornton contains exculpatory evidence. ([117] at 4-5). Defendant maintains that the Thornton interview could have been used to impeach Pier Mason[3] whose testimony the Court permitted as evidence of other related tax fraud acts under Fed. R. Evid. 404(b). Testimony from Pier Mason directly implicated Hunte in the filing of a fraudulent return that resulted in money being wired to an account owned by Hunte. (Tr., Vol. 3 at 554-66). Defendant argues:

> The government during the trial and consistently in the reports of interviews that were turned over, refers to Signature Tax Specialist. This was alleged to be the tax company owned and operated by the defendant. The investigative reports indicate that the company had an office on Peachtree Road N.E. This court allowed the government to call as a witness Piers Moran [sic]. Ms. Moran [sic] was interviewed by S.A. Buford on March 13, 2013 and she specifically stated that she went to the office of "Hunte", Shonda Johnson, at 3348 Peachtree Road N.E., suite 700, Atlanta, Ga. 30326 and spoke to someone there who stated that Shonda was not there.
>
> The interview of Mr. Thornton, conducted by S.A. Buford, was conducted nine months after Moran's [sic] interview and S.A. Buford knew exactly what evidence he was trying to elicit from Thornton. He wanted Thornton to state that Signature Tax Specialist and

---

[2] None of the 23 interviewees testified at trial.

[3] Defendant's Motion refers to "Piers Moran," but a "Piers Moran" did not testify at trial.

4

> Leshonda Hunte had rented office space at that location. Mr.
> Thornton states in the report, just turned over to defense, that he is the
> property manager of Parkway Properties, and that nowhere in his
> records could he find an office rented to Leshanda Hunte or Signature
> Tax Specialist. The report goes on to state that Mr. Thornton
> contacted the previous property manager who stated he had no
> information concerning a Signature Tax Specialist or Leshanda Hunte.

([117] at 4-5). Defendant argues that had she "known about this exculpatory evidence she could have called either S.A. Buford or Mr. Thornton which would have certainly contradicted the testimony of Piers Moran [sic] and any other evidence that the defendant was operating a tax business." ([117] at 5).

Second, Defendant contends that the suppression of Special Agent Buford's memorandum documenting his interview with Dwight Johnson prejudiced her defense. Defendant states:

> Mr. Johnson was the attorney representing Esa Jeffries. This new
> report indicates that Attorney Johnson stated to S.A. Buford that "if
> the USAO is willing to forego federal charges and get the state
> charges dropped against Jeffries, they would be open to cooperating."
> There was an interview conducted later by S.A. Buford with Jeffries.
> There was no mention of the proffered deal by Mr. Johnson. This
> evidence turned over yesterday prevented counsel from investigating
> any of the facts contained in the interview and whether preferred
> treatment was given to Jeffries.

([117] at 5).

The Government opposes Defendant's Motion. With respect to the Thornton interview, the Government notes that it produced interview documents

5

reflecting the entirety of Pier Mason's testimony at trial. ([126] at 12-13). The Government also notes that the case agent's interview memo for Pier Mason produced before trial documents Mason's unsuccessful attempt to locate the person she spoke to on the phone about her tax return by going to the tax preparation service, Signature Tax Specialist, at 3348 Peachtree Rd. NE, Suite 700, Atlanta, GA 30326. ([126] at 13; [126.1] at VIC-00385-90; see also [126.1] at VIC-00391-92).

With respect to the interview of Mr. Johnson, Jeffries' attorney, the Government notes that, contrary to Defendant's speculation, "Jeffries never entered into a proffer, cooperation or other agreement with the government." ([126] at 25). The Government further notes that it provided before trial the one substantive interview for Jeffries and argues that Defendant was well aware of his role in the scheme and could have interviewed him and called him as a witness. (Id.).

## II. DISCUSSION

### A. Legal Standard

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Rule 33 recognizes that if a trial court concludes for any reason that the trial has resulted in

6

a miscarriage of justice, the court has broad powers to grant a new trial." 3 Charles Alan Wright et al., Fed. Prac. & Proc. Crim. § 581 (4th ed. Apr. 2016 Update).

To succeed on a motion for new trial based on newly discovered evidence, Hunte must prove that: (1) the evidence was discovered after trial, (2) the failure of the defendant to discover the evidence was not due to a lack of due diligence, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material to issues before the court, and (5) the evidence is such that a new trial would probably produce a different result. United States v. Barsoum, 763 F.3d 1321, 1341 (11th Cir. 2014) (citing United States v. Jernigan, 341 F.3d 1273, 1287 (11th Cir.2003) (citations omitted). "Courts should use great caution in granting such motions as they are highly disfavored." Jernigan, 341 F.3d at 1287.

To obtain a new trial based on a Brady claim of newly discovered evidence, Hunte must show that: "(1) the government possessed favorable evidence to the defendant; (2) the defendant does not possess the evidence and could not obtain the evidence with any reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed to the defendant, there is a reasonable probability that the outcome would have been different." United States v. Vallejo, 297 F.3d 1154, 1164 (11th Cir. 2002). "Evidence favorable to the accused includes impeachment evidence." United States v. Newton, 44 F.3d 913,

918 (11th Cir. 1994). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682, (1985) (quotation omitted).

"'[T]he burden to show a Brady violation lies with the defendant, not the government[.]'" United States v. Stein, 846 F.3d 1135, 1145 (11th Cir. 2017) (quoting United States v. Esquenazi, 752 F.3d 912, 933 (11th Cir. 2014)).

B.  Analysis

1.  The Thornton Interview Memo

Defendant failed to meet the four requirements necessary to obtain a new trial based on a Brady claim that the Government's failed to produce the Thornton memo. The Government admits that the prosecution inadvertently suppressed the Thornton memo by not producing it before trial. ([126] at 18). But the Defendant failed to carry her burden of demonstrating the remaining three requirements.

First, the Thornton memo does not contain evidence that would have been favorable to Defendant at trial. The Government did not, as Defendant contends, rely on evidence or testimony concerning Defendant's involvement with Signature Tax Specialist or her renting of an office, much less at 3348 Peachtree Road. Even if admissible, the information in the Thornton memo does not impeach the testimony Pier Mason gave at trial concerning the filing of an unauthorized tax

8

return or undermine the documentary evidence showing that $2,000 of Mason's refund went to an account owned by the Defendant. Mason testified about her phone calls with a "Shanda Johnson" and the filing of an unauthorized tax return. Mason did not associate the Defendant with Signature Tax Specialists or an office located on Peachtree Road.

The Thornton memo also does not establish that Mason was untruthful with investigators. Documents produced before trial show that Mason told investigators that an unidentified "property manager" advised her that the individual she was seeking was "Shonda Hunte." ([126.1] at VIC-000390 and VIC-000363). That Thornton could not corroborate that second-hand information does not impugn Mason, especially when the records show that Regency, the listed tenant at that location, shared their office space with others and Thornton did not have access to those records. ([126.3] at SENTENCING000057-58). The Thornton memo does not discredit any testimony or evidence offered at trial or otherwise undermine Mason's credibility.

Second, Defendant could have obtained the information in the Thornton memo using reasonable diligence. The Government produced documents before trial disclosing much of the information contained in the Thornton memo. For instance, Defendant knew that Mason's return was prepared by Signature Tax

9

Specialist, that Mason went to 3348 Peachtree Road to find the person who filed the false tax return, and that Mason was told the business was connected to Hunte. ([117] at 4; [126.1] at VIC-000390 (case agent memo), VIC-000363 (Mason complaint to IRS), VIC-000392 (police report); see also [77] (motion to exclude much of this evidence)). Of course, the Defendant was well aware whether she worked at that location and, with minimal effort, could have obtained testimony or evidence from those on site that neither she, nor Signature Tax Specialist, operated out of that location.[4] The Thornton memo offers nothing that was not readily available to Defendant through the exercise of reasonable diligence.

Third, there is no reasonable probability that the outcome of the trial would have been different had the Government provided the Thornton memo before trial. As explained above, the Thornton memo does not undermine Mason's Rule 404(b) testimony or exculpate Hunte.

---

[4] Defendant asserts in reply that "[t]here is no information the defendant could have gathered about the management company or Thornton (his name was not known to the defendant, as it was contained in the report) in 2011 and 2012 without knowledge of the interview taken by Buford" in 2013. ([127] at 8). But Defendant knew of Mason's statements to investigators, knew the location Mason visited to confront "Shanda Johnson," and knew whether Defendant operated out of that location. Exercising reasonable diligence, Defendant could have obtained leasing records from the management company to question Mason.

The Thornton memo also does nothing to undermine the overwhelming direct evidence of Defendant's guilt, much less raise a reasonable probability of a different trial outcome. Even without Mason's Rule 404(b) testimony and evidence, the Government presented compelling evidence that Hunte knowingly converted government funds and it is highly unlikely that the Thornton memo would cause any juror to acquit Defendant on any of the five counts of theft of government funds or the conspiracy count. The Government introduced evidence showing that Hunte and Menard schemed to deposit tax refunds from at least 16 different fraudulent tax filings into two bank accounts jointly owned by Hunte and Menard (JPMC 2018 and JPMC 8063) within a two-month period in the Fall of 2012. (Exs. 11-12, 28, 28A, 29-36, 28, 39, 41-46, 48-53, 97-102; Ex. 5 at 12, 25, 27; Ex. 6 at 14, 17, 19, 21, 22, 25, 27, 28, 30, and 32; Ex. 8 at 2). The Government further presented evidence establishing that Hunte used those funds for personal expenditures (Exs. 5-6; Tr., Vol. 1 at 213) and that Hunte frequently visited the bank branch and actively managed the bank accounts while Menard did not (Tr., Vol. 1 at 203-05). When an account was frozen, Hunte represented that she was a tax preparer in an attempt to legitimize the deposits and gain access to the funds. (Tr., Vol. 1 at 205-10). The evidence also established that Hunte, along with her cousin Ruben Lawrence, actively participated in converting the Joseph Allen check

11

under false pretenses, knowing that they were stealing government funds. (Tr., Vol. 1 at 211-19; Exs. 18, 19, 21, 61A, 83). That just days later Menard used similar false credentials and attempted the same scheme to convert the Antonio Rubie check evidences Hunte's involvement and likely direction of Menard's activities. (Tr., Vol. 1 at 215-25, 229; Exs. 23, 24, 25, 26, 59B, 60A, 87).

Hunte's knowledge and intent to steal Government funds in the Fall of 2012, was also contained in evidence of similar acts in 2011 that was introduced by the Government at trial as well as documents implicating Hunte in Mason's 2012 fraudulent tax return. The evidence showed that fraudulent tax refunds were deposited into accounts that Hunte owned jointly with Menard (e.g. JPMC 8063), but also into an account owned solely by Hunte (JPMC 7230). (Ex. 28A; Exs. 47-53; Ex. 11 at 3, 5; Ex. 12 at 3, 5; Ex. 13 at 2). This money, including the funds deposited into Hunte's JPMC 7230 account, was used for personal expenditures like rent and travel. (Exs. 12 and 13).

Pre-trial production of the Thornton memo would not have changed any of this compelling evidence that Hunte actively conspired and worked to steal government funds as charged and convicted. The Government did not need the testimony of Mason to secure a conviction.

Defendant argues that the Mason testimony was the only evidence tying Defendant to the filing of a fraudulent tax return. ([127] at 3). But this argument overlooks the documentary evidence as well as evidence establishing that Defendant represented herself as a tax preparer to bank personnel and sought to obtain frozen funds by explaining that the deposited funds were from tax refunds. It was also enough for the Government to show that the Defendant converted the funds without showing that she actually filed the fraudulent returns. Mason's Rule 404(b) testimony was not "essential" to Defendant's conviction or in any way "crucial to the government's case, as she contends. ([127] at 4-5, 9).

Defendant failed to carry her burden of establishing that the Government's production of the Thornton memo after trial was a Brady violation.[5]

---

[5] Defendant raises for the first time in her reply that she is entitled to a new trial based on "Giglio violations." ([127] at 10). "[I]n Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Supreme Court held that the government's failure to correct false testimony that its key witness (the defendant's coconspirator) had received no promise of nonprosecution in exchange for his testimony, as well as the prosecutor's false statement to this effect in closing argument, required that the defendant be granted a new trial. Ventura v. Attorney Gen., Fla., 419 F.3d 1269, 1277 (11th Cir. 2005). "In order to prevail on a Giglio claim, a petitioner must establish that the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony, and that the falsehood was material." Id., quoting Tompkins v. Moore, 193 F.3d 1327, 1339 (11th Cir. 1999). As explained above, Mason did not provide testimony, much less false testimony, regarding her effort to locate the filer of her

2. The Jeffries and Attorney Johnson Interview Memos

Defendant asserts that belated production of the Johnson memo "prevented counsel from investigating any of the facts contained in the interview and whether preferred treatment was given to Jeffries." ([117] at 5). The Government counters that "Jeffries never entered into a proffer, cooperation or other agreement with the government" and that Defendant had all the pertinent information regarding Jeffries (i.e. the substantive interview for Jeffries and the report of the Dunwoody Police Department regarding Jeffries' arrest). ([126] at 25-26). Defendant did not address the Jeffries or Attorney Johnson memos in her reply brief.

After reviewing the belatedly produced Jeffries and Attorney Johnson memos and considering Defendant's argument, the Court finds that the memos do not contain new evidence material to Defendant's case. To the extent, if any, the memos contain new information, it was readily available to Defendant through the exercise of reasonable diligence. Defendant was well aware of Jeffries' role in the case and could have interviewed him before trial or called him as a witness. Nothing in the Jeffries or Attorney Johnson memos suggests that the production of these memos before trial would probably have produced a different result.

---

unauthorized tax return or that those on site advised her that it was Shonda Hunte. Defendant has not established a <u>Giglio</u> violation.

Defendant failed to carry her burden of demonstrating a need for a new trial based on newly discovered evidence.

### 3. Other Reports

Defendant argues that the Government's suppression of 26 reports could not have been inadvertent. But Defendant failed to cite any authority holding that the Government's degree of culpability affects the standards for obtaining a new trial for a Brady violation as described in Vallejo, 297 F.3d at 1164, or based on the discovery of new evidence under Rule 33 as described in Jernigan, 341 F.3d at 1287. Each of those standards requires a showing that the production before trial of any of the withheld information would probably have resulted in acquittal on at least one count. Defendant made no such showing.

Defendant further states in reply that "[w]hen the motion for new trial was filed by the defendant, counsel had just 2 days to review all 26 reports, prior to travelling to Atlanta for the sentencing. Yet, the government accuses the defendant of cherry picking reports. In fact, there are other reports that may be exculpatory." ([127] at 2-3). Defendant did not identify any other reports she contends are exculpatory, much less carry her burden of demonstrating that production of those reports before trial would probably have resulted in a different outcome. The Government's suppression does not warrant a new trial.

United States v. Buck, 847 F.3d 267 (5th Cir. 2017), does not demand a new trial as Defendant contends. ([117] at 7; [127] at 7). Buck merely refers to an earlier mistrial caused by the government's failure to "turn[] over all of the required discovery materials, including witness statements, a police interview with Buck, and two police lineups." Id. at 271. Buck does not apply the standards for determining whether a new trial is warranted. The short description of the earlier mistrial also suggests that, unlike the suppressed documents here, the suppressed discovery items in Buck were material to Buck's defense.

### III. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant Leshanda Hunte's Motion for New Trial Pursuant to Rule 33(b) [117] is **DENIED**.

**SO ORDERED** this 18th day of May, 2018.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE